[Cite as *State v. Smith*, 2024-Ohio-1557.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| Plaintiff - Appellee | : | Hon. W. Scott Gwin, J. |
| | : | Hon. John W. Wise, J. |
| -vs- | : | |
| | : | |
| MARISSA GRACE SMITH, | : | Case No. 2023CA00063 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:                    Appeal from the Stark County Court
of Common Pleas, Case No. 2022-
CR-2253


JUDGMENT:                                   Affirmed


DATE OF JUDGMENT:                           April 23, 2024


APPEARANCES:

For Plaintiff-Appellee                      For Defendant-Appellant

KYLE L. STONE                               EUGENE D. O'BYRNE
Prosecuting Attorney                        101 Central Plaza South, Suite 500
Stark County, Ohio                          Canton, Ohio 44702


By: VICKI L. DESANTIS
Assistant Prosecuting Attorney
110 Central Plaza South, Ste. 510
Canton, Ohio 44702-1413

*Baldwin, J.*

{¶1}    The appellant, Marissa Grace Smith, appeals her conviction and sentence by the Stark County Court of Common Pleas. Appellee is the State of Ohio. The relevant facts leading to this appeal are as follows.

## STATEMENT OF THE FACTS AND THE CASE

{¶2}    On December 1, 2022, the Stark County Grand Jury indicted the appellant with one count of Murder, in violation of R.C. §2903.02(B), and one count of Felonious Assault, in violation of R.C. §2903.11(A)(1).

{¶3}    On December 9, 2022, the appellant pleaded not guilty.

{¶4}    On April 27, 2023, the appellant filed a Motion to Compel Discovery requesting the appellee to provide the police interviews of I.E., C.C., and A.S. The appellant also filed a Motion in Limine to exclude the testimonies of I.E., C.C., and A.S. since the appellee had not provided the recordings.

{¶5}    On April 28, 2023, the appellant filed a Motion to Compel Discovery, requesting the appellee to provide the recording of the interview of L.H.

{¶6}    On May 4, 2023, the trial court held a hearing on the appellant's motions. The trial court granted the motions to compel and ordered the appellee to provide all of the requested videos that had not yet been provided.

{¶7}    On May 8, 2023, the matter proceeded to a jury trial. The appellee first called T.B. to testify. T.B. testified that the victim, M.M., was her nephew and was born on June 7, 2020. She also testified to M.M.'s character trait of peacefulness.

{¶8}    Next, I.E., a fourteen-year-old, testified that on September 13, 2022, he went to Wildwood Park with his old brother C.C., A.S., and the victim to hang out. Upon

arriving at the park, a different group of juveniles approached them to start fighting. I.E. identified some of the juveniles as J.F., J.B., and L.H. After the fight, the appellant got in I.E.'s face and began to scream at him. In response, C.C. pushed the appellant. The appellant then spat in C.C.'s face. Then, C.C. and A.S. spat in the appellant's face. I.E. testified that the appellant was not part of the initial altercation but came after. As I.E. and his group started to leave, the appellant ran at them with a knife. The victim stepped in front of his group, and the appellant stabbed M.M. in the chest. M.M. fell to the ground. I.E. and A.S. went to get help while C.C. stayed with the victim. By the time police arrived, the appellant, L.H., J.F., and J.B. were not at the scene.

{¶9} During I.E.'s testimony, the State played surveillance video from the water treatment facility showing the boys walking away from the fight. I.E. identified the appellant with the open switchblade running toward the boys as they left with an open knife.

{¶10} I.E. admitted he told police that no one touched the appellant, but that she was shoved twice. He also could not identify the appellant in the courtroom as having stabbed the victim.

{¶11} C.C. then testified that he was with the victim, A.S., and I.E. at Wildwood Park on September 13, 2022. Once arriving at the park, C.C. said he saw J.F. with J.B. J.F. gestured that he was reaching for a weapon, so they fought him. C.C. said the appellant then ran up and got in his face, and he asked her to step back. The appellant then got in I.E.'s face, and C.C. pushed her back. C.C., A.S., M.M., and I.E. began walking away when the appellant ran at them, yelling. M.M. pushed I.E. out of the way and said that he was not afraid to die. The appellant then stabbed M.M. in the chest. M.M. pulled

the weapon out of his chest and fell to the ground. The appellant, J.F., and J.B. then ran away.

**{¶12}** The State then called A.S. to testify. During his testimony, A.S. said he was friends with C.C. and M.M. He knows I.E. through C.C. On September 13, 2022, he went with C.C., I.E., and M.M. to Wildwood Park anticipating a fight. A.S. said that they found the group they were supposed to be fighting, caught them, and beat them up. He then walked away to leave the park when the appellant came over the hill yelling about her boyfriend being beaten up. She ran back towards A.S. and his group with a knife and said she was not afraid of them and would stab them. The victim then yelled at the appellant to put the knife away and that if she was going to stab anyone, to stab him. The appellant then stabbed the victim. The victim knocked the appellant's arm away, pulled out the knife, then fell to the ground. The appellant then ran away.

**{¶13}** Next, Officer Miller testified that he responded to the incident. Upon arriving at the scene, the stab wound was no longer bleeding, and the victim appeared to be in cardiac arrest. Officer Miller hooked the victim up to an AED, but the heart was not in a shockable rhythm. The Officer spoke with I.E., C.C., and A.S. They acknowledged that they saw the stabbing; however, they did not know the name of the person who did it. They described the individual who stabbed the victim as a young female with braces.

**{¶14}** After interviewing the witnesses, Officer Miller recovered the knife from the crime scene.

**{¶15}** Lieutenant Allensworth then testified that the witnesses were upset when he arrived on the scene. He separated them and took their statements. He then went to J.F.'s house to bring him to the police department for an interview. After the interview, he

then went to the appellant's house to take her into custody. He also testified that he took initial oral statements from the witnesses without separating them.

{¶16} Detective Pilla then testified he was called into the scene of the incident. He separated the witnesses and took their statements. During these interviews, L.H.'s name was brought up. Detective Pilla, in an effort to gain more information, contacted the School's Resource Officer who is familiar with the students. The School Resource Officer gave Detective Pilla the Appellant's name and also J.F.'s name as someone who also hangs around L.H.

{¶17} During L.H.'s interview, L.H. stated he left the park before anything happened. However, upon reviewing security footage from the water treatment plant, Detective Pilla noted that L.H. was present for the incident and returned for a second interview. Detective Pilla then interviewed J.F.

{¶18} On cross-examination, Detective Pilla testified that during his interview of L.H., L.H. claimed that the victim pulled the appellant toward him, alleging the stabbing was an accident.

{¶19} Next, the School Resource Officer, Rachel Carosello, testified that she provided the appellant's name to law enforcement based on their description. Carosello interviewed several juveniles in connection with the investigation. Carosello also testified that C.C.'s initial account did not match that of the other boys, and C.C. then changed his account.

{¶20} Dr. Galita, a forensic pathologist, then testified that the victim's cause of death was a .75-inch wound in his chest caused by a double-edged blade. Dr. Galita identified the weapon collected at the scene to be consistent with causing the victim's

wound. Dr. Galita also testified that the victim had amphetamine and methamphetamine in his system at the time of his autopsy.

**{¶21}** The State then rested its case.

**{¶22}** The appellant moved for an acquittal pursuant to Crim.R. 29. The trial court denied the appellant's motion.

**{¶23}** The appellant's first witness was J.B. He testified he knew the appellant through J.F. J.B. testified that the day prior to the incident, I.E.'s father was at the park trying to get someone to fight I.E. J.F. fought I.E. and I.E.'s father eventually broke up the fight. He then yelled that they would be back tomorrow to fight again. J.B. testified that as they attempted to leave the park, a black car pulled up, and C.C. jumped out and started to yell at them. J.B. testified that C.C. and four other boys started beating J.B. and J.F. After the fight, J.B. testified he left the park to go to a friend's house and did not see the stabbing. J.B. testified that he, the appellant, and J.F. did not bring any weapons to the park.

**{¶24}** J.F. then testified that he used to date the appellant, and they still talked. He went to Wildwood Park on September 12, 2022, to fight I.E. I.E.'s father said that they would be back the next day to fight again. J.F. testified that R. came to the park with J.F. on September 13, 2022, to fight I.E.'s father. R. left before any fighting took place.

**{¶25}** J.F. testified he was carrying a knife that day. As J.F. and J.B. were leaving the park, I.E. and three other boys got out of a car and started chasing J.F. and J.B. J.F. said A.S. punched him ten times and slammed him into the ground, that C.C. beat up J.B. first, then turned his attention to J.F. The appellant came over to where J.F. and J.B. were and yelled at A.S. and C.C. The group then turned to the appellant. The group began to

push and spit on the appellant. They also started to yell at L.H. J.F. then pulled his knife out; the appellant took the knife from J.F. and ran to help L.H. J.F. said L.H. is a friend who has Asperger's Syndrome. As the appellant approached, the victim yelled that he was not afraid of the knife and that he was going to kill the appellant. J.F. testified that the victim grabbed the appellant and pulled her toward him, and that is when the knife went into the chest. The appellant began to run toward J.F. and L.H. because the group now had the knife.

{¶26} J.F., L.H., and the appellant then ran through the woods to a playground, where they waited for a bit and then went home separately. He said the video from the water treatment plant did not accurately depict what took place that day because it did not show the entirety of what transpired.

{¶27} Next, Dr. Maneesha Pandey testified that she was a forensic pathologist. She testified that a person holding the knife horizontally and colliding with another person could have caused the injury.

{¶28} Finally, the appellant testified that on September 13, 2022, she missed the bus home from school, so she walked to the park to wait for her grandmother to pick her up. The appellant testified that she heard J.B. yell her name and call for help. She saw C.C. beating up J.F., and J.B. was on the ground. She started shouting, asking what was happening.

{¶29} The appellant testified that C.C. pushed her and then began walking toward L.H. L.H. was yelling for help. J.F. removed his knife from his waistband. The appellant took the knife from J.F. and asked how to open it. J.F. showed her, and the appellant ran down the hill toward L.H. After yelling at the group that the police were on the way, the

group backed away from L.H. and started to yell at her that they were going to kill her. The victim grabbed the appellant, pulled her to him, and then she let go of the knife. She said she fled with J.F. on J.F.'s bike, and L.H. ran away. She said she did not intend to stab anyone; she only wanted to scare them away. The appellant said she did not know anyone had died until her interview began.

{¶30} The next day, the jury returned a verdict of guilt of murder and felonious assault.

{¶31} On May 22, 2023, the trial court held a sentencing hearing, and the appellant was sentenced to a term of fifteen years to life in prison.

{¶32} The appellant filed a timely notice of appeal and raised the following three assignments of error:

{¶33} "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST APPELLANT, AND THE CONVICTION MUST BE REVERSED."

{¶34} "II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND MUST BE REVERSED."

{¶35} "III. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HER RIGHTS UNDER THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."

**I., II.**

**{¶36}** In the appellant's first and second assignments of error, the appellant argues that her convictions were not based upon sufficient evidence and were against the manifest weight of the evidence presented. We disagree.

**STANDARD OF REVIEW**

**{¶37}** The appellant challenges her convictions on both manifest weight and sufficiency of the evidence grounds. Sufficiency of the evidence was addressed by the Ohio Supreme Court in *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754:

> The test for sufficiency of the evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). " 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs" R.C. 2901.05(E). A sufficiency-of-the-evidence challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶219.

**{¶38}** Thus, a review of the constitutional sufficiency of the evidence to support a criminal conviction requires a court of appeals to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**{¶39}** Manifest weight of the evidence, on the other hand, addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668. The Court stated:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis added.) Black's, *supra*, at 1594.

*Id.* at 387

**{¶40}** The Court stated further:

> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the fact finder's resolution of the conflicting testimony. *Tibbs*, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, *State v. Martin* (1983), 20 Ohio

App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*Id.*

**{¶41}** In addition, "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *

**{¶42}** "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

### ANALYSIS

**{¶43}** R.C. §2903.02(B) states: "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

**{¶44}** R.C. §2903.11(A), in pertinent part states:

No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn[.]

{¶45} During its case-in-chief, the State played a video showing I.E., C.C., A.S., and the victim walking away from the fight. Moments later, it shows the appellant running at the group of boys with an open knife in her hand.

{¶46} At trial, I.E. testified that he, the victim, C.C., and A.S. fought with J.F. and J.B. on September 13, 2022. As I.E., C.C., and A.S. were leaving Wildwood Park after the fight, the appellant ran up to the group with a knife and started screaming and threatening the boys. The victim responded to the appellant, saying he was not afraid of her. She then stabbed the victim in the chest and ran away. The victim then fell to the ground.

{¶47} C.C. then testified that on September 13, 2022, he was at Wildwood Park with the victim. He saw J.F. motion as if he had a weapon on him, so they fought J.F. and J.B. After the fight, C.C. testified he was walking away with I.E., the victim, and A.S. when the appellant ran up and started yelling at them. C.C. pushed her back out of his face. The victim then stepped in between and said he was not afraid to die. The appellant then stabbed the victim. M.M. removed the knife from his chest and then fell to the ground. The appellant then ran away with J.F. and J.B.

{¶48} A.S. also testified he went to Wildwood Park anticipating a fight. After the fight, as he was leaving with the victim, the appellant ran toward them with a knife. She was yelling at them for beating up her boyfriend. After being threatened by the appellant, M.M. responded that he was not afraid of her or of being stabbed. At that point, she stabbed him and then ran away. The victim removed the knife and fell to the ground.

{¶49} The appellant also testified at trial that she was at Wildwood Park on September 13, 2022. While there, J.F. was in the group calling for help. Upon reaching J.F., who had been in a fight, she testified that she saw the victim, C.C., A.S., and I.E. approaching L.H. The appellant took a knife from J.F., asked him how to open it, and then she ran, yelling at the group. She said that upon arriving at the group, she was pushed and spit on, the victim grabbed her and pulled her to him, and the knife accidentally went into the victim's chest. He then removed the knife, and she fled. The appellant also called J.F. and J.B. to testify. Their testimony was consistent with the appellant's testimony.

{¶50} We have thoroughly reviewed the trial proceedings in this case, and we find that, after viewing all the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the appellant committed the essential elements for the crimes with which she was charged. Furthermore, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the appellant's convictions must be reversed and a new trial ordered. We, therefore, find that the appellant's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. Accordingly, the appellant's first and second assignments of error are overruled.

**III.**

{¶51} In the appellant's third assignment of error, the appellant argues she was deprived of effective assistance of counsel as her trial counsel failed to raise a self-defense or defense of another claim and to object to improper character evidence of the victim's character. We disagree.

**STANDARD OF REVIEW**

**{¶52}** The standard of review for ineffective assistance of counsel was set forth in the seminal case of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and was discussed by this court in *Mansfield v. Studer*, 5th Dist. Richland Nos. 2011-CA-93 and 2011-CA-94, 2012-Ohio-4840:

> A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell*, 506 U.S. 364, 133 S.Ct. 838 (1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

**{¶53}** In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both prongs of *Strickland* and *Bradley. Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009).

**{¶54}** To show deficient performance, the appellant must establish that "counsel's representation fell below an objective standard of reasonableness." *Strickland* at 688. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Strickland* at 687. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial process. *Strickland* at 688.

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.*

In light of "the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant," the performance inquiry necessarily turns on "whether counsel's assistance was reasonable considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668 at 689, 104 S.Ct. at 2064. At all points, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland v. Washington*, 466 U.S. 668 at 689, 104 S.Ct. at 2064.

*Studer, supra*, at ¶¶58-61. Even debatable trial tactics and strategies do not constitute ineffective assistance of counsel. *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

**{¶55}** Thus, in order to prevail on an ineffective assistance of counsel argument the appellant must show both: 1) that his trial counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of an essential duty to the appellant; and, 2) that the appellant was prejudiced by such the alleged ineffectiveness.

### ANALYSIS

### Self-Defense/ Defense of Another

**{¶56}** R.C. §2901.05(B)(1) provides:

(B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶57}** "A defendant is entitled to an instruction on self-defense when evidence has been presented that tends to support the defendant acted in self-defense." *State v. Holladay*, 5th Dist. Stark No. 2023 CA 00021, 2023-Ohio-3577, citing *State v. McCallum*, 10th Dist. Franklin No.19AP-796, 2021-Ohio-2938, ¶38. "[Similar] to the standard for

judging the sufficiency of the state's evidence, if the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden." *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶25, citing *State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999); *State v. Robinson*, 47 Ohio St.2d 103, 109-112, 351 N.E.2d 88 (1976). "A defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶25. However, "[a] bare assertion by the defendant that he acted in self-defense into issue in the trial." *State v. Jacinto*, 8th Dist. Cuyahoga No. 108944, 2020-Ohio-3722, 155 N.E.3d 1056, ¶47, quoting *State v. Gideons*, 52 Ohio App.2d 70, 73, 368 N.E.2d 67 (8th Dist.1977).

**{¶58}** In the case *sub judice*, counsel engaged in sound trial strategy by not raising self-defense or defense of others to justify the appellant's stabbing of M.M. These defenses conflicted with the appellant's testimony that her conduct did not lead to the stabbing of the victim. Instead, the appellant argued that the stabbing was an accident caused by the victim when he pulled the appellant toward him. She also submitted testimony from J.B. and J.F. supporting her version of the facts. Accordingly, the appellant has not shown that trial counsel's performance by failing to request a self-defense or defense of another jury instruction fell below an objective standard of reasonable representation.

**Failure to Object to Character Testimony**

**{¶59}** Evid.R. 404(A)(2) states:

**{¶60}** *Character of Victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

**{¶61}** In the case *sub judice*, the State's first witness testified that the victim was very compassionate. At this point in the trial, no testimony had been admitted that the victim was the first aggressor. Therefore, the statement is objectionable under Evid.R. 404(A)(2). However, the appellant failed to show how this brief statement and trial counsel's failure to object to the statement affected the outcome of the trial. Indeed, trial counsel's failure to object could have been tactical. "Trial counsel is not ineffective for choosing, for tactical reasons, not to pursue every possible trial objection." *State v. West*, 5th Dist. Fairfield No. 16 CA 11, 2017-Ohio-4055, 91 N.E.3d 365, ¶102, citing *State v. Raypole*, 12th Dist. Fayette No. CA2014-05-009, 2015-Ohio-827, ¶24. This is because "[o]bjections tend to disrupt the flow of a trial and are considered technical and bothersome by a jury." *State v. Steele*, 12th Dist. Butler No. CA2003-11-276, 2005-Ohio-943, ¶100, citing *State v. Hill*, 75 Ohio St.3d 195, 211, 661 N.E.2d 1068 (1996). Especially with such brief testimony, trial counsel may not have wanted to call attention to the statement. Furthermore, the Supreme Court of Ohio held that "the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶103.

**{¶62}** Accordingly, the appellant's claim of ineffective assistance of counsel regarding trial counsel's failure to object to improper character testimony is overruled.

**{¶63}** Therefore, the appellant's third assignment of error is overruled.

## CONCLUSION

**{¶64}** For the forgoing reasons, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby, affirmed.

By: Baldwin, P.J.

Gwin, J. and

Wise, John, J. concur.